```
 1              IN THE UNITED STATES DISTRICT COURT
                IN AND FOR THE DISTRICT OF DELAWARE
 2
                              -  -  -
 3
      EXTRICOM LTD.,                    )        Civil Action
 4                                      )
                  Plaintiff,            )
 5                                      )
            v.                          )
 6                                      )
      MERU NETWORKS, INC.,              )
 7                                      )
                  Defendant.            )        No. 10-391-GMS
 8
                              -  -  -
 9
                        Wilmington, Delaware
10                    Tuesday, October 25, 2011
                            10:00 a.m.
11                        Markman Hearing

12                            -  -  -

13    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

14    APPEARANCES:

15            LINHONG ZHANG, ESQ.
              Fish & Richardson, P.C.
16                   -and-
              NAGRENDA SETTY, ESQ.
17            Sheppard & Mullin
              (Atlanta, GA)
18
                                Counsel for Plaintiff
19
              JACK B. BLUMENFELD, ESQ.
20            Morris Nichols Arsht & Tunnell LLP
                     -and-
21            ROBERT STONE, ESQ., and
              JORDAN JAFFE, ESQ.
22            Quinn Emanuel Urquhart & Sullivan LLP
              (Redwood Shores, CA)
23
                                Counsel for Defendant
24

25
```

1          THE COURT:  Good morning, counsel.  Please take

2     your seats.

3          Counsel, let's start out with a round of

4     introductions, please.

5          LINHONG ZHANG:  Good morning, Your Honor.

6     Linhong Zhang from Fish & Richardson for Extricom.  With me

7     I have Nick Setty From Sheppard Mullin.

8          THE COURT:  Good morning.

9          Mr. Blumenfeld.

10          MR. BLUMENFELD:  Good morning, Your Honor.  Jack

11     Blumenfeld from Morris Nichols for Neru, along with Robert

12     Stone and Jordan Jaffe from Quinn Emanuel in California.

13          I understand, Your Honor, that there was a fire

14     alarm in the hotel that both sides are staying in last

15     night.  If people seem a little groggy today, you will

16     understand.

17          THE COURT:  Understood, counsel.

18          Please, take your seats, counsel.

19          Counsel, we are going to, unfortunately, have an

20     interruption in our schedule.

21          How much time do you anticipate?  What did we

22     set aside, two hours for this?

23          MR. SETTY:  Yes, Your Honor.

24          THE COURT:  We are not going to have two hours

25     this morning.  We are going to work until 11:15, then we

1      will break until 12:30 -- I am sorry for the

2      inconvenience -- but then we will be able to finish up, if

3      everything is not finished up at that point, after lunch.

4                  I have another matter at 4:00.  We should have

5      enough time.

6                  MR. SETTY:  Can we speak for just a moment about

7      the time, Your Honor?

8                  If it is okay with Your Honor --

9                  THE COURT:  It is absolutely okay if you want to

10     finish by 11:15.

11                 MR. SETTY:  We will each take 35, and leave time

12     for questions.  Obviously, if you want to keep going

13     afterwards, we would be perfectly happy to stick around.

14                 THE COURT:  No.

15                 MR. STONE:  We have reached a few compromises,

16     Your Honor.

17                 THE COURT:  Okay.

18                 MR. STONE:  Hopefully, that will speed up the

19     process.

20                 MR. SETTY:  Unless you have a different

21     suggestion in mind, Mr. Stone, I have planned for it in what

22     we edited in the morning.  If we get to a construction and

23     there is a compromise to which we have agreed, Robert and I

24     can concur on that.

25                 THE COURT:  Put it on the record.

1          MR. STONE:  Yes.

2          THE COURT:  That is fine.

3          Let's go.  Start with plaintiff.

4          MR. SETTY:  Judge Sleet, I did not introduce Mr.

5     Rottam, Gideon Rottam, he is the CEO for Extricom.  And he

6     has come in from Israel for these proceedings today so he

7     could be present, and also to observe his first Markman

8     hearing.

9          THE COURT:  Well, this has to be a first.  I

10    don't think we have had a CEO at a Markman hearing.  At

11    trial, yes.

12         MR. SETTY:  Mr. Mosher is a Georgetown law grad.

13    We joked that he didn't know what Markman was.  I told him

14    that meant he was a real lawyer and probably didn't do IP as

15    a profession.

16         But we are happy to have him here today.

17         THE COURT:  I hope that doesn't mean I am not a

18    real judge because I know what Markman is.  But in any

19    event, go ahead.

20         MR. SETTY:  I wouldn't suggest that in any way,

21    shape or form, Your Honor.  I think you know what I mean.

22    Folks who do regular litigation and corporate don't tend to

23    be knee-deep in the stuff that we do.

24         THE COURT:  I understand.

25         MR. SETTY:  We will try keep this tight.  As Mr.

1   Stone said, we have a number of compromises that we reached

2   last night.  I think it helped a lot.  Last night, as Mr.

3   Blumenfeld mentioned, we had a fire drill at the Hotel

4   DuPont at 1:00 a.m.  Not knowing my opposing counsel were

5   there, it was kind of funny to see the other guy on the fire

6   escape, the other guy wearing a hat, which was my friend and

7   noted counsel, Robert Stone.

8           The patent at issue, the '549 patent, U.S.

9   Patent No. 7697,549, is entitled Wireless LAN Control Over A

10  Wired Network.  Before I get into the specifics of the

11  technology and the technical disputes, I think we will just

12  lay a little bit of context.

13          I will be referring to it as the '549 patent.

14          The applications that led to the issuance of the

15  '549 patent go back to 2002, 2003.  So we are talking about,

16  from a kind of skilled artisan perspective, we have to put

17  ourselves back almost a decade.

18          And the reason I put it that way is that the

19  standards that we will be talking about that control things

20  like WiFi, wireless LANs, wireless local area networks,

21  those were younger protocols and standards at that time.

22  And now we are all used to courtrooms that are wired, homes

23  that are wired.

24          THE COURT:  Except this one.  But go ahead.

25          MR. SETTY:  I thought yours was being redone on

1    **4A.   Perhaps when we go back down...**

2              **THE COURT:  As a report to local counsel, we are**

3    **working on that.**

4              **MR. SETTY:  Aside from this courtroom, the**

5    **prevalence and proliferation of wireless networks is now**

6    **such that we have them in our cars, we have them in our**

7    **homes.  I think it is important that you think back ten**

8    **years to where that wasn't the case, those networks were not**

9    **prevalent and pervasive in the same manner.**

10             **The patent issued in 2010, in April.  The**

11   **parties were engaged in some level of discussion at the**

12   **time.  So we had a standstill that was in place.  After the**

13   **patent issued, we filed suit here in May, well aware, Your**

14   **Honor, that Meru filed just after in the Northern District**

15   **of California.  And Your Honor has decided that issue to**

16   **remain here.**

17             **So we find ourselves dealing with what was**

18   **originally going to be eight claim construction disputes**

19   **relating to the language of this particular solution as it's**

20   **claimed in Claim 1.  There are several other claims that**

21   **have been asserted.  But all the primary issues are**

22   **illustrated in Claim 1.**

23             **So after the standstill we filed suit.  The real**

24   **reason was that the Meru product that has now been in the**

25   **marketplace for roughly the same time period adopts and uses**

1    the key solutions that are in the '549 patent.  The best

2    way, I suppose, to touch on those is to start at a high

3    level, then we will bring it right down into individual

4    constructions.

5              The basic operation of a wireless network can be

6    done under many different standards.  The most prevalent

7    standard is one that came out of IEEE, which, as you know,

8    is the Electronics and Electrical Engineers.  The standard

9    itself is 802.11.  And there are many, many iterations of

10   that at this point.  It started as 802.11A, et cetera.  Now

11   you can buy a little $100 router for your home that would

12   cover everything from A to N and would cover all of the

13   different iterations of the standard.

14             That ends up being kind of a key part of the

15   constraints that drive the technologies that the parties

16   sell.

17             It is incredibly important that when you bring

18   in a laptop, a mobile station, mobile device, that you be

19   able to operate with the network without having to have

20   customized customer hardware.  So from the client's side,

21   you are really trying to have it operate agnostic to any

22   additional improvements that are taking place under the hood

23   on the network side or the server side.

24             Here you will see, as we go through the language

25   of the patent, that we are talking about the use of

1    primarily conventional 802.11 hardware; we are talking about

2    the fact that although that is the illustration that is

3    given in the patent, that it can work with many other

4    protocols; and that will end up manifesting in a couple of

5    the different claim construction disputes; and then finally,

6    that you have the ability to essentially have a system that

7    is compliant with those standards so that you can bring gear

8    in and out of the system that's stamped "802.11 Compliant"

9    and it will generally work with the system.

10            The exceptions are the patented ones.  So the

11   patented improvements here are intended to give higher

12   managerial control over the system, and although if we had

13   one or two devices in here that could connect to the WiFi we

14   probably wouldn't have any problems.  I was in India today,

15   meaning I flew back through Amsterdam last night.  And I

16   started out at 6 a.m. --

17            THE COURT:  You are not going to drop in front

18   of us, are you?

19            MR. SETTY:  I might.

20            It's quite possible I would.

21            But when I landed, I was at the lounge working

22   at 6 a.m., and I had zero problems getting connectivity.  By

23   the time I left at 9:00, I had almost no connectivity.  That

24   doesn't mean the infrastructure changed.  It doesn't mean

25   the pipe, if you will, the size of the network throughput

1     changed.  It simply meant that with the number of users you

2     had in the room, and we were all competing for the same

3     resources, we were probably literally bumping each other off

4     of the WiFi.  So I would have intermittent connectivity, if

5     that makes sense.

6              If you ever wanted to test that when you are

7     using it, you would check off the little button when you are

8     in the wireless commands where it says connect

9     automatically.  Once you turned that off, you would find

10    that you would get bumped off and not bumped right back on.

11    So you would have to literally continue to reconnect.

12              The technology that Extricom has come up with

13    here and that Meru is using in the marketplace has to do

14    with that type of management.  One example that Mr. Rottam

15    and I discussed is WiFi for Madison Square Garden.  You can

16    imagine the number of simultaneous users now, with iPhones

17    and pads and everything that one has to manage.  So what we

18    are talking about in this patent is bringing additional

19    managerial functionality to the system, doing it in a way

20    that is agnostic so that conventional hardware and software

21    can be used in connection with it, but to give specific

22    additional management functions that allow you to manage the

23    kind of IDs that are used to connect the mobile stations to

24    the network, to manage the access points that are going to

25    be used to respond back to the mobile devices.

1          So it's at that level that you see the

2    improvements from these patents.  We are not talking about

3    the 20 years worth of work that went into the committees

4    that came up with the standards.  We are talking about

5    improvements on top.

6          All right.  This is a figure from the patent.

7    It's not a particularly unusual one.  I know Your Honor has

8    done other networking cases.  So we just have a relatively

9    straightforward set of devices here.  This is Figure 1 from

10   the patent.  Out here you will see To WAN, or wide area

11   network.  And if you looked at the specification, you would

12   see this particular device is a gateway.  That means

13   although we are talking about the wireless device's

14   conductivity to the wire LAN, the wire LAN goes out to the

15   world.  So this particular device, each particular device

16   will have network access.  No different than if I used my

17   laptop or my IPhone, I would be able to connect through the

18   wireless network, to the wire network, and then go search

19   something on the Internet.

20         So this is the basic configuration for that.

21         These devices that have X's on them, that is the

22   graphic or icon for a switch.  So we know that we have a

23   mobile station that's connected --  that is Item 32 --

24   that's connected to an access point, which is a very

25   conventional part of the 802.11 standard and here identified

1    with Item No. 30.  Then that is attached to a switch.  And

2    that allows you to either operate within the cloud of this

3    network or go out to the Internet.

4            Then you see this device right here, which says

5    BSS Manager.  And as I was telling you, one of the ways in

6    which this technology has improved the performance of the

7    networks is through additional management.  This device,

8    BSS, uses that acronym for Basic Service Set, which is one

9    of the premises of using an 802.11 or Internet-based TCP IP

10   network or any of the other types of protocols that are

11   being used for wireless networks -- Bluetooth, HiperLAN.

12   There is lots of them.  And the patent references them all.

13           So this is not meant to be limited to 802.11 but

14   as the key illustration of the most prevalent.  So BSS

15   Manager there is intended to connote the managerial

16   functions themselves to which I was referring.

17           It is important, when we talk about this, and

18   when I think about Meru's briefs, that we maintain a bright

19   line between what are embodiments and the scope of the

20   claims, because I think the biggest concern I have about the

21   Meru briefs is that there is no real bright line there

22   anymore.  There is a blurring between what has been imported

23   from the specification that appears to really be an

24   embodiment in a particular instance and the claim scope,

25   which is much broader.  That's where I have most of my

1    concerns and why I don't think we were able to resolve more

2    of these constructions beforehand.

3                So if you look at the specifications, that are

4    described in Block 1, you will see the same graphic in

5    Meru's brief.  And we have not exchanged slides, but I would

6    expect we would see the same thing there.  So we will not

7    end up having a lot of disagreement about the general

8    construct.  We will be in the specifics of the managerial

9    functions.  This deals with an embodiment.  It is meant to

10   be by way of example, as you will see on Line 3.  This I

11   think is the key term in describing the figures.  It says

12   that you ought to be able to work in substantially any

13   topology known in the art.  I think that's key, because the

14   patent itself speaks to the fact that engineers skilled in

15   this area are going to be able to tweak, design, implement.

16   But the key is that it works with any topology.

17               The next line alludes to the aspect that I

18   mentioned to you a moment ago.  You need not have any

19   special or nonstandard properties in order to serve the

20   wireless LAN.  And, as I mentioned, again, it goes out to

21   the Internet through gateway 29.

22               Sticking with the same figure here in Slide 3,

23   we will also see that the key parts that comprise our terms

24   that are in dispute are also all mentioned here.  In the

25   same context of this embodiment, we know that we have access

1    point 30.  We have mobile stations 32.  We know that the

2    access points and mobile stations communicate with one

3    another in accordance with one of the standards in the

4    IEEE 802.11 family.  You will see, as intrinsic evidence,

5    Your Honor, we have adopted a couple of those standards,

6    incorporated them by reference.  That ends up being

7    important because when we talk about the true intrinsic

8    record here, we have to incorporate the 1999 IEEE standards,

9    the 2002.  And then there is a specific reference in the

10   patent that says, Obviously, these standards will evolve.

11   And we really intended to incorporate the whole suite.

12             So that's what's been incorporated here by

13   reference.

14             I mentioned to you that it was meant to work

15   with other standards.  Again, this is from the specification

16   here.  It says, the type of WLAN, including HiperLAN,

17   Bluetooth, hiswan-based systems, it is not intended to be

18   limiting, and likewise, the standards that are mentioned

19   here are intended to be illustrative.

20             So let's go to the actual claim construction

21   disputes.

22             We are here in Claim 1.  I have just tried to

23   highlight so that they are taken in context, the disputes as

24   they arose in the sequence that's in the briefing and in the

25   charts.

1          So we start with "access points."  I will not go

2     deep into any of these now because the points themselves are

3     pretty straightforward, when we get to the constructions.

4     But this particular one is access points.

5          Then we have the "manager node," which is the

6     third indent to the elements.  That is obviously the situs,

7     the virtual situs for all the managerial functions that we

8     will be adding.

9          We have this concept of a basic service set ID,

10     it's called a BSSID in the art.  That is the type of thing,

11     at least in my home, it is called the "SettyLAN" because we

12     have named it as such and you have the ability to customize

13     the name of the LAN based on who set it up.

14          So this is that type ID, whether it is in easy

15     letter form that you and I can see, that is the "Netty" for

16     my house, or the underlying long number that essentially

17     represents the ID for that network.

18          We also have "uplink packet," "to convey

19     messages responsively to the uplink packet."  And then at

20     the bottom, the last essentially five lines of the claim,

21     which have to do with the process of selecting one of the

22     access points to be the responsive one.

23          So if you can again envision all of this in the

24     context of my Madison Square Garden example, you have got

25     40,000 users in there.  Let's even say a significant

1    percentage, 10,000 of them have devices that can work with

2    the wireless network.  That's the type of problem we are

3    trying to address.

4              So I have this table that really reflected where

5    we were yesterday.  And then, as you heard, last night there

6    were several proposals made, some of which we have been able

7    to accept.

8              Your Honor, at the end of this process, I will

9    submit a new version of the table, since the joint claim

10   construction table now can be reduced down to a couple more

11   agreements.

12             But for today's purpose, since this all

13   happened, I have just done it with strike-throughs.  As we

14   go through each of these, I will show you where the language

15   was, where it's gone.  And if we can get a concurrence we

16   will move to the next one.

17             On the first point, "access point," I think we

18   have a couple key issues.  First of all, the compromise that

19   was proposed last night is right here.  The term is access

20   point.  Extricom believes that the Court need not construe

21   this because it's such a widely used term.  There is people

22   that set up the networks in this building that would

23   understand that.  Someone skilled in the art would certainly

24   understand it.  And the term is defined in many of the

25   standards.

1              So you might ask, why don't we just pick one of

2    them?  The answer is, we know from the case law that you

3    don't need to paraphrase or reinterpret that which doesn't

4    require it.  I think what Meru's construction attempts to do

5    is simply paraphrase from a tactically beneficial

6    perspective for their argument later what they believe an

7    access point ought to be construed to mean, and it simply

8    doesn't require it.

9              We started out yesterday with a construction

10   that an access point was a device that enables a mobile

11   station to communicate over the air with a network within a

12   service region.

13             Now, "within a service region," that language,

14   you will see, I have done a strike-through.  That is the

15   part that they have removed in order to reach a compromise.

16             If you look at the briefing, in particular, the

17   reply brief from Meru, you will see that some two or three

18   pages out of 20 is devoted to this service region concept.

19   Given that they have abandoned that, I won't bore you with

20   it, Your Honor.  But the remaining part of Meru's proposed

21   construction is still "a device that enables a mobile

22   station to communicate over the air with a network."

23             There are many such devices.  They are not just

24   access points.  There can be other devices that satisfy that

25   definition.

1          I think this is purely an attempt to take what

2    is known as an access point and to change it so that the

3    language that you would give to it would then read on other

4    devices in the art that were perhaps part of the prior art

5    patents that were either of record or that would be raised

6    in the invalidity challenges.

7          So access point, it doesn't require

8    construction.  The plain and ordinary meaning is sufficient

9    for one skilled in the art.  And, truthfully, I think the

10   issue here is that the patent is very clear that an access

11   point provides normal access point functionality.  And the

12   part where we disagree is that there is also a disclosure

13   here where you can modify the access points to give

14   additional functionality, some of the managerial

15   functionality to which I alluded a moment ago.

16          If we look at this example that is on my Slide

17   10 -- Your Honor, we will submit the slides afterwards so

18   that the transcript will align with it -- you will see at

19   the bottom that I have quoted from the patent Column 9,

20   Lines 4 through 9:  "The use of conventional wireless LAN

21   hardware is," as I mentioned before, "preferred.

22          "To achieve the novel functionality of the

23   present invention is generally advantageous in reducing the

24   cost of the system."

25          So you use standard stuff.  It is going to be

1    cheaper.

2                    "Alternatively, or additionally, access points

3    may comprise custom or semi-custom hardware."

4                    The way in which the patent teaches that is that

5    you can put in a new chip in the patent -- in the access

6    point.  You could put in a new board, which is akin to a

7    printed circuit board.  But the point is, you can

8    additionally, or alternatively, modify the access point.

9                    So the way I look at this is the base access

10   point is the conventional one, and it says so.  If you want

11   to tweak or add functionality to the access point, you can

12   do it from a hardware or software perspective.

13                   When Meru argues that the patent doesn't use the

14   term access point in that conventional manner, this is the

15   argument they made on the top left part of this slide, they

16   argue, "Implementing this mode of operation requires

17   modifying the behavior of the access points."

18                   I think the bolded language here says the whole

19   story.  There is a mode of operation of this invention,

20   where you would, again, going back to the quote here,

21   alternatively, or additionally, modify the access point.  It

22   doesn't preclude the basic access points that work with and

23   are defined in the standards and that this patent

24   contemplates as the conventional hardware that would be used

25   in the most inexpensive and efficient iterations of the

1    invention.

2            That is it on access points, Your Honor.

3            "Manager node" is the next term.  You will see

4    that, again, just as in the briefing, we have carried forth

5    the same convention.  The italics here is intended to

6    identify where the disagreements are.

7            In the far left we see this is manager node,

8    that is the term.  The asterisk proposal is "one or more

9    device that coordinate and control various operations of the

10   access points."

11           So again, you have to have a manager.  Just as

12   with a manager in an office, here, the manager is intended

13   to control traffic, because that's what network managers do.

14   They control the access points.  They control which ones are

15   going to respond.  They control the way in which traffic

16   flows.

17           If you look at the Meru construction, there are

18   two parts that are problematic and inconsistent with the

19   intrinsic record.  The first is in Line 1.  It says "a

20   device."  You will see mine, the asterisk column says "one

21   or more devices."

22           So the test is whether the patent teaches that

23   you have to have a single physical device performing the

24   manager node functions or whether you can have more.  And

25   when I show you the evidence, you will see it is abundantly

1    clear the patent specifically calls out examples with

2    multiple devices.

3              Then the last part that is a problem is where

4    Meru attempts to exclude access points from serving manager

5    functions.  You will see it says, "A device that coordinates

6    and controls" -- we agree on a function -- "the operation of

7    the access points over the LAN and is not an access point."

8              So it's like saying that I can't be a manager

9    and also a worker on this particular team.

10             In this particular example we are saying that

11   the manager has to be a distinct and separate physical

12   element on the network and cannot serve as an access point.

13   Let's see how that holds up.

14             This is probably the hardest slide to read, Your

15   Honor.  I apologize.  It is the size of the quote.  I will

16   read the cites into the record so it is useful.  What we

17   have done on the right-hand side of the page with Figure 1

18   is simply graded out and shown the key function here.

19             Item 34 was the BSS manager.  Whether you look

20   at the intrinsic record or even any of the literature

21   surrounding this, the manager functionality is what we are

22   talking about with the manager node.  I don't think there is

23   going to be much debate about that.

24             If we look at the quote in the far left here, it

25   says, "The functions of the manager may be divided among two

1   or more units."

2           So we are talking about whether the construction

3   ought to be limited to a device or whether one or more

4   devices is more appropriate.

5           You will see here then, right at the top of

6   Column 7, in the quoted section, in Lines 29 to 49, it

7   specifically says it can be one or more units.  That makes a

8   lot of sense in the networking world, because in a networked

9   environment, the devices are meant to be and are

10  fundamentally connected.  That's why it's a network.  So you

11  can split and kind of parse the functionality and put them

12  in different devices.  The key is that you have the

13  managerial functions, not which specific box or processor is

14  doing the work.

15          It carries out that particular description

16  throughout this paragraph.

17          The next highlighted passage you will see here,

18  it says, "The packet processor, whether integrated with or

19  separate from the control processor, may also perform packet

20  encryption and decryption functions, which are typically

21  performed by the access points themselves."

22          So now we are taking access point functionality

23  and blurring the line between that and the manager.

24          So if we go to the second issue, which was "and

25  not an access point," you will see here that the patent

1   teaches you how you would take managerial functions and

2   split them and essentially blur the line between access

3   points and management.

4          Here is how it does it.

5          It says the control processor and packet

6   processor may be contained physically in a single box or in

7   separate boxes.  "Alternatively, or additionally, the

8   control processor and/or packet processor may be physically

9   integrated in the form of one or more plug-in boards."

10         Where do boards go?

11         If we go to the next page, you will see

12  specifically, it says, "Access points 30 may comprise custom

13  or semi-custom hardware for purposes of the present

14  invention.  For example, some or all of the MAC layer

15  functions of the manager may be performed by a

16  field-programmable gate array."

17         That FPGA, or gate array, is essentially a type

18  of logic in a chip.  There is a term that you may have heard

19  in other cases called an ASIC, which is an

20  application-specific integrated circuit.  That's what we are

21  talking about here.  You can put a chip that does this stuff

22  that this manager has to do into the access point.  So you

23  will see, the patent specifically teaches that it can be one

24  or more devices, and it specifically teaches that it can be

25  done within the access point using a custom board or a chip.

1              So those go directly to the Meru constructions.

2     That's why their proposal is completely inconsistent with

3     the intrinsic record.

4              And that's it for access points.

5              We then go to "a mobile station."  If you look

6     at the left --

7              THE COURT:  Was that it for manager node?

8              MR. SETTY:  That's it.

9              THE COURT:  You said access points.  I wanted to

10    make sure we weren't back to access point.

11             MR. SETTY:  My apology, Your Honor.  We are done

12    with manager node.

13             Far left, "A mobile station with a common basic

14    service set ID for all the access points."

15             We don't have a disagreement about what the

16    BSSID concept is.  As I mentioned before, it would be a

17    numerical value that exists in the system that actually

18    constitutes an ID, such as an encrypted value.  It can also

19    be represented in a way that is more accessible to humans.

20    Like I said, my network is called "Settynet."  And that is

21    really just kind of a translation of the basic service set

22    ID.  So we don't have a disagreement on this.

23             This is the only case you are going to hear me

24    talk about today where Meru is going with the plain and

25    ordinary meaning.  Here is where the confusion arises when

one does that.  Based on the arguments I have seen in their

briefs, my concern is about the phrase "all the access

points."  You will see here it appears as "all the access

points."

Your Honor is familiar with the notion that in

patent parlance we have antecedent basis from lower elements

in the claim up to earlier elements.  And here, if you look

at Claim 1 as a whole, the place where "all the access

points" appears is below the initial instances of access

points.  As a result, it's simply using the article B to

refer to A, to access points above.

When it is defined above it says "a plurality of

access points."  My concern is this:  that some day we are

going to be in front of Your Honor on a summary judgment

motion and the argument is going to be that the Meru system

doesn't have all of its access points system-wide on the

same ID, and their argument is going to be, well, Your Honor

construed this to mean all the access points so all of them

have to be on the same ID.

That ignores some key functionality that is in

the patent that says, a plurality of access points needs to

be on the same ID.  That leaves open the possibility that in

an overall network you have many different groups of that.

If you can envision, Your Honor, a network that

would cover -- we will stick with the Madison Square Garden

```
 1    example -- you know, in one part, essentially down past the

 2    baseline, where the Knicks would play, you would have one

 3    ID, ID-1.  That is Group 1.  Then on the sideline, on the

 4    visitors' side, you have ID-2.  On the other baseline, ID-3,

 5    and on the other side of the stadium ID-4.  That's

 6    completely contemplated in the system.  But not all the

 7    access points on the network are on one ID.  That is going

 8    to be a noninfringement argument.

 9              So I wanted it to be clear that what is required

10    above in the claim is a plurality, so just multiple access

11    points.  If we look at the evidence that is of record, you

12    will see why that is both consistent with the intrinsic

13    evidence and why Meru's proposal ignores it.

14              This is a section that deals with what is called

15    access point grouping.  It says here, we are talking about

16    the '549 patent, Column 8, Lines 4 to 21, "Access points 30

17    in the system are preferably closely spaced, operate on a

18    common frequency and a common ID."

19              That is first embodiment that is taught.  That

20    supports Meru, not me.

21              Second.  "For increased capacity, the system 20

22    may include other similar groups of access points not shown

23    in the figure."

24              So it is mentioned but not illustrated.

25              They operate on other frequency channels to the
```

1    extent permitted by the applicable standards and regulatory

2    regulations.  Each of these groups has its own ID, so, like

3    I said in my example, four IDs on the network, and operates

4    in a manner substantially identical to that described

5    hereinbelow with respect to access points 30.

6           If we drop down to the next highlight, the

7    different groups are substantially independent of one

8    another and may be regarded as separate systems.

9           So it's meant to be fluid and flexible.  In my

10   example with four zones, let's call them, or segments,

11   within Madison Square Garden, it's still practicing the

12   invention.  It's still operating in a way that there is a

13   managerial functionality that is managing which access

14   points talk to which users.  It is just that they are going

15   to float four different IDs in the air, and depending on

16   where you are sitting, you are going to have a stronger

17   signal from the access points in that zone and it will

18   gravitate you towards that.  It will just work more

19   efficiently.  And the system contemplates those kinds of

20   groups.

21           Meru's construction, where it just says all the

22   access points, is confusing and misleading because it

23   certainly connotes that every access point on the system has

24   to have the same ID.  The patent teaches otherwise.

25           "Uplink packet" is one where we have reached

1    agreement last night.  So you will see that originally the

2    issue was, we were offering plain meaning, and Meru had the

3    language through which I have stricken.  I believe that we

4    are agreeing now to the plain and ordinary meaning.

5               MR. STONE:  That is correct, Your Honor.

6               THE COURT:  All right.  Thank you.

7               MR. SETTY:  So we get to skip past a few slides.

8               "Conveying messages responsive to the uplink

9    packet," Your Honor, when your ready.  It is the next

10   construction.  On this one as well, we have reached

11   agreement that we go with plain and ordinary meaning.

12              MR. STONE:  That is correct, Your Honor.

13              THE COURT:  All right.

14              MR. SETTY:  On this one, Your Honor, the next

15   term at issue is the longest paragraph of the claim.  You

16   will remember, it is the last five lines if you look at the

17   claim in its original form in the columns of the patent.

18              Here we had a proposal.  It was I think offered

19   as a compromise.  You will see the strike-through language

20   on the far right.  It's to take out "one and only one."

21              MR. STONE:  That is not entirely correct, Your

22   Honor.  You are probably aware from the briefing that it has

23   been Meru's position that this claim language is indefinite,

24   and because it's indefinite we understand from Your Honor's

25   practice that we don't address it at this time.

 1                    What we said to counsel last night was, look, we

 2    are going to hold off on addressing this claim phrase until

 3    we request Your Honor's permission to file a summary

 4    judgment motion concerning indefiniteness.

 5                    THE COURT:  So the strike-through does not

 6    reflect the compromise that you have achieved?

 7                    MR. SETTY:  It was, I think, to try to reconcile

 8    those two statements.  It was offered as a compromise as to

 9    the actual construction.  But they still want to maintain

10    the right to seek leave to file summary judgment on this.

11    So we still have to address it.

12                    THE COURT:  Let's assume for a moment I don't

13    grant permission to file summary judgment.

14                    MR. SETTY:  Then we don't have an agreement on

15    the construction.

16                    MR. STONE:  Your Honor, because of our position

17    that the claim phrase is indefinite, we don't believe it's

18    capable of construction.  And what we had proposed is in

19    connection with summary judgment we would brief why it is

20    that it's indefinite.  We believe that they would probably

21    say in response --

22                    THE COURT:  If I don't permit that briefing,

23    counsel, and give you an opportunity to raise that argument,

24    do you want to offer a construction?

25                    MR. SETTY:  There is one here, Your Honor.

1    THE COURT:  That is what I thought.  I am trying

2    to understand where we are.

3    MR. STONE:  I guess, Your Honor, our preference,

4    Your Honor, would be to try to address the indefiniteness

5    issue first.

6    THE COURT:  I get that, counsel.  But that's not

7    going to be the way it goes.  Today is claim construction.

8    What I am trying to understand, understanding that you have

9    a summary judgment argument you would like to make,

10   assuming, if you would, for a moment, that I am not going to

11   grant permission to make that, what is your position

12   regarding how I should construe this particular term?

13   MR. STONE:  If Your Honor wants us to provide an

14   alternate construction at this point in time, we can do

15   that.  I think I would like to spend a minute speaking with

16   counsel about what that would be.

17   THE COURT:  You might want to do that, because I

18   am not going to -- you have had your chance.  My practice is

19   well known.  Many times in the past, when counsel have

20   wanted to argue indefiniteness, they have, wisely, at least

21   proposed an alternate construction, in anticipation of the

22   possibility, if not the likelihood, that you are not going

23   to get a chance to make that argument at summary judgment.

24   So I will certainly give you permission to offer

25   something today.  But I am not going to accept anything

1    after today.

2              MR. STONE:  I appreciate that, Your Honor.

3    Thank you.

4              MR. SETTY:  Your Honor, if we go back to this

5    particular term, where we were before last night was that we

6    had a disagreement about the actual construction as well as

7    the indefiniteness issue.

8              So this is a long phrase, and it has a lot of

9    different parts to it.  What I have done on the far left is

10   I have highlighted the problem with Meru's position.  And

11   let's put aside the indefiniteness issue just like I have in

12   trying to negotiate.  Let's just read from it so I can parse

13   it for Your Honor as I see it.  Then we can address what is

14   in the far right column from Meru.

15             It says, "so as to select" -- we are talking

16   about the manager node.  This is one of the functions of the

17   one or more devices we were talking about earlier.

18             "...so as to select one of the access points to

19   respond to the uplink packet."

20             So if Your Honor can put yourself in a seat at a

21   Knicks game, you are using your iPhone, and the first thing

22   that happens when you click on the WiFi functionality is

23   that it sends out a packet that says, Judge Sleet's phone is

24   here.  Then the system has to respond back with information

25   indicating which access point will be communicating with

1    Judge Sleet's phone.  So this claim term attempts to define

2    those things that happen in between.

3              So we have to select one of the access points.

4    We know we have to select something on the network to

5    respond to your iPhone that says, okay, you have access now.

6    The middle part says to send an instruction via the switch

7    to the selected one of the access points.

8              So the manager tells the switch, and then the

9    switch sends a message back to the selected access point,

10   which will then speak to your phone.

11             It goes on to say, "to transmit to the mobile

12   station a response to the uplink packet within a time limit

13   specified by the WLAN protocol."

14             So we will get to the times issue in a moment

15   because there are many different times that are set forth in

16   the standard for trying and retrying connectivity.

17             But the part that is missing in Meru's proposed

18   construction is the middle.  In other words, I believe the

19   plain and ordinary meaning is sufficient.  And that's

20   Extricom's position, because when you read this, one skilled

21   in the art would know you have to be able to do what I just

22   described in the record, meaning you have to be able to

23   receive a message from the mobile station, make a decision

24   as to which access point is going to respond, and then

25   communicate that response back to the mobile station.

1        That is the process.  Plain and ordinary meaning

2   is sufficient to describe that, especially in context here.

3        Now, Meru's position, as you can see on the

4   right, was that it is indefinite.  Let's get past that.  The

5   proposed construction, again, before last night, was that

6   you should construe it as, "so as to select one and only one

7   of the access points to respond to the uplink packet within

8   a time limit."  Now they have stricken the "one and only

9   one" language based on last night's negotiation.  So what we

10  would be left with is "so as to select one of the access

11  points to respond."

12       Now, the reason I have a problem with that is,

13  one of the proscriptions from the Federal Circuit is, don't

14  paraphrase when you don't have to.  Don't rewrite it when it

15  doesn't add clarity.  Here, we are skipping the whole step

16  that the claims require of sending an instruction from the

17  switch back to the access point.

18       I can't imagine why Meru wants a claim term to

19  be broader in its construed form than it was in its original

20  form, because before it had that specific step in it or that

21  specific function in it.  I can only see that as being an

22  aid to them on invalidity:  let's remove one of the problems

23  we are having in finding art and try to broaden the claim.

24       So that is my basic problem here, Your Honor, is

25  that the plain and ordinary meaning gives everything one

1    skilled in the art will need.  It gives everything the jury

2    will need.  You have to select an access point.  You have to

3    send an instruction.  And then there is a response to the

4    mobile station.  Those are the parts of the claim.  You skip

5    Part 2 in the Meru proposal.

6              As Mr. Stone said, I am happy to talk to him

7    outside of here with respect to anything that resolves that

8    issue.  But that's where we are, Your Honor, right now in

9    terms of the status.

10             THE COURT:  And I want to make it clear that I

11   perhaps was being a little obtuse.  I do understand that

12   Meru has offered a proposed construction.

13             MR. SETTY:  He is not coming in naked on that

14   issue, Your Honor.  That was the construction before.  I

15   presume that what we would be talking about is any further

16   modification to try to get rid of the issue.

17             Just to pick up here and to move through this

18   relatively quickly.  If we get past the issue of including

19   the middle part of the claim, the part where there is a

20   response sent through the switch, then the only issue we

21   have is this question of time limit.

22             Meru's position, and you are going to see a lot

23   of this today, is that there was one specific argument made

24   in the prosecution to get these claims allowed and there was

25   one specific time limit that was alluded to in those

1   arguments.

2          It's this one that is originally put forth in

3   the specification, Your Honor.  It's the last of the four

4   highlighted lines here.  That is that the mobile station, in

5   this case Judge Sleet's iPhone, is expecting an ACK, which

6   is a short form for acknowledgment, within ten microseconds

7   under one version of the standard or 16 microseconds under

8   another version of the standard.  I have a couple problems

9   with limiting Extricom to that particular set of times.

10  That is the goal, by the way, in the Meru constructions.

11          The problems are the following.

12          One, those are two iterations of the standard.

13  They are not all of the iterations even of just 802.11.  So

14  certainly there are other time limits that one could

15  envision for the initial try.  Just with the two standards,

16  and this is a document written in 2002, you have to

17  remember, that says we are not limited to this standard.

18  Even in the examples given, for one of them it is ten

19  microseconds, for the other one it is 16 microseconds.  You

20  remember I showed you specifically there were other

21  protocols listed, like Bluetooth and HiperLAN and hiswan,

22  they all have different time limits for initial

23  acknowledgment.  So limiting us to one particular time limit

24  would be to completely throw out the part of the disclosure

25  that has us working in our protocols.

1              That is kind of problem one.

2              Problem two is, every time this talks about, the

3    patent talks about the initial attempt to connect, it also

4    talks about retries and retransmissions, because,

5    unfortunately, the way these things work, it isn't always

6    the case that you get a connection on the first attempt.

7              Sometimes when I am at Starbucks with my laptop,

8    it will take me a couple minutes to get a good connection,

9    and that's because the systems are negotiating with each

10   other.

11             Right here, if you look at the bottom part of

12   this quoted paragraph, this is the '549 patent, Column 11,

13   Lines 15 to 27, it says, "The mobile station will retransmit

14   the association request until it receives a response.  If no

15   response is received within a predetermined time limit, the

16   mobile station will treat the association request as having

17   failed."

18             So you can think of this as a kind of sequence

19   of activity.  First request, it can work under any of the

20   individual time frames that work for any of these protocols.

21   If that doesn't work, it retries, retransmissions.

22   Specifically, expressly noted in the intrinsic record.

23             So then the question is, how many retries?  And

24   I pointed to it in the brief about even using the 802.11

25   iteration from 1999, which is expressly incorporated by

1    reference, you retry 535 times.  So you can imagine how this

2    ten microseconds is now a couple seconds.

3              To in any way limit us to one specific iteration

4    of that, harvesting that from the prosecution history, just

5    ignores the entire intrinsic record and it ignores how these

6    standards work.

7              Quickly on Slide 28 here, I have identified the

8    specific blocks from the 802.11 standard, where these are --

9    where these types of functions are described in a way that

10   the engineers would understand.

11             And this particular figure is from the 2007

12   iteration, and Meru's brief takes issue with that.  You will

13   see in my briefing, in the reply briefing in particular, we

14   have cited to all of the parallel portions of the 1999

15   standard.  So if they have a problem with the 2007 graphics,

16   Your Honor, we will view them as illustrative.  But the

17   reply brief gives parallel citations to the same concept of

18   retries as it's baked right into the 1999 version of the

19   standard.

20             So there is nothing here that is arguably

21   outside of the intrinsic record.

22             And when we look at this figure, if you look at

23   the straight line in the top half, you will see that that is

24   written up as a series of events.  This is all you really

25   have to appreciate, that little graphic there that shows

1    that this particular process would be cycled, it would retry

2    until a connection is successful.

3              When we go --

4              THE COURT:  I am going to have to get you to

5    move it along.

6              MR. SETTY:  I think we are almost at the end,

7    Your Honor.

8              So then, when we get to the specification again,

9    as to the selection, the main reason, from a topology

10   standpoint, why this can't just be something that is done in

11   the one-time limit by the one device that Meru would have

12   you use is that the patent specifically contemplates that

13   these functions can be distributed around the network.  I

14   showed you where the specification said it could be one or

15   more devices.  I showed you where the specification said it

16   could be integrated into access points.

17             Then how that matters here is that if the

18   managerial functions are divided so that some of the

19   functions are being done at the access point and some are

20   being done in other manager devices, that is why the Meru

21   constructions ultimately remove the "one and only one" part

22   of the construction.

23             You can envision, if we go back, for the last

24   time, to the Madison Square Garden example, where Judge

25   Sleet's iPhone speaks to the manager, the manager says,

1    let's have Zone 4 respond to him based on where he is

2    sitting.  But then Zone 4's access points also have part of

3    the manager functions so they can really decide which

4    specific access point has the best signal and would speak to

5    your phone.

6              The "fragmentation" is the last issue.  I won't

7    bore you with all of the details.

8              The issue is plain and ordinary meaning versus a

9    specific kind of fragmentation.  And you will see, Your

10   Honor, that I have put you on the specification.  There is

11   three sites on Slide 33 here that are all relevant.  And in

12   the interests of time, let me just point you to the key

13   words.  The fragmentation methodologies that Meru likes and

14   wants you to focus on came only from an embodiment, not from

15   the invention as a whole.  And you will see this language,

16   typically, it's done a certain way:  Additionally, or

17   alternatively, the fragmentation can be done another way.

18             We go to the next passage, it starts with

19   "Typically" again, you go to the next passage, it starts

20   with "Alternatively."

21             This is just a classic case, Your Honor, where

22   we all agree that fragmentation is necessary for those

23   elements that have that, but not the specific fragmentation

24   method that is illustrated in the patent specification.

25   It's always couched as an alternative, as an option, or as

1    typical.

2            The very last issue is one where Meru has not

3    offered a construction.  And it's just, what does it mean to

4    be substantially in accordance with the IEEE 802.11

5    standard?  Meru's view is "substantially" there is the

6    confusion, that one skilled in the art wouldn't understand

7    what "substantial" means there, and therefore, there is no

8    offer of a construction.  It's just indefinite.

9            If we go back to Your Honor's premise, this is

10   one where there isn't an offer of a construction.

11           And from my perspective, the Federal Circuit has

12   dealt with this issue many times.  In specific, on 802.11,

13   and we cited Your Honor in the briefing to Fujitsu v.

14   NetGear, where the issue was whether, if someone says they

15   are complying with the standard, whether, if the claims read

16   on the standard, if you can just stop there and not do

17   proper infringement analysis.  And the Court said, no, you

18   still have to do infringement analysis, but here is why.

19   Some parts of the standard are optional.  Some parts of the

20   standard are mandatory.  And those skilled in the art would

21   know which parts those are.

22           But the Federal Circuit has treated that as a

23   fact, that people skilled in the art would understand how if

24   you would buy conventional gear that would perform certain

25   things.  It doesn't have to perform everything in the

1  standard.  It has to be substantially compliant, which means

2  it performs the mandatory bits.

3            THE COURT:  I have got you, Mr. Setty.

4            MR. SETTY:  Thank you.  That's all, Your Honor.

5  Thank you.

6            MR. STONE:  Thank you, Your Honor.  I will try

7  to move through quickly so we can make it through in the

8  time that we have discussed.

9            I appreciate counsel for Extricom going through

10 some of the background.  I am going to spend a little bit of

11 time just to put things in perspective for our arguments.

12           THE COURT:  I am going to cut you off at 20

13 after, okay?

14           MR. STONE:  Thank you, Your Honor.

15           In conventional 802.11 systems, typically, each

16 access point has its own network ID or BSSID -- that's what

17 we were talking about earlier -- and a mobile station will

18 associate with only one BSSID at a time.  So the mobile

19 station, the laptop, a cellphone, will typically, in a

20 conventional network, wireless network, only associate with

21 a single BSSID.  And once it does that, then when it sends

22 messages to an access point, it's going to use the

23 identifier associated with that access point.

24           So then traditional access points will only

25 respond to messages that indicate their BSSID.

1          So if, in this situation, the AP1 network ID is

2      the network ID for AP1, if that message goes out to AP2, a

3      different network, there would be no response.

4          So one problem that was recognized in connection

5      with the prior art was obtaining sufficient coverage.

6          So Mr. Setty was mentioning Madison Square

7      Garden.  You would need a tremendous number of access points

8      to be able to provide coverage to the entire building.  One

9      problem that occurs in prior art systems, people would

10     employ multiple access points, is that there would be

11     collisions between the radio waves, because they are all

12     operating on different frequencies.  So one solution that

13     was contemplated in connection with prior art systems was

14     using a single BSSID for multiple access points.  And then

15     what happens is the mobile station will view the entire

16     collection of access points as a large network.

17         But that in and of itself leads to some

18     additional problems, namely, a mobile station can only

19     receive one response, expects to only receive one response.

20     So it would be confused if it sends out a message to

21     multiple access points, because they are all using a single

22     ID, and it receives back multiple responses.

23         So one solution that Extricom believed that it

24     came upon for this was to employ the manager node.  And Mr.

25     Setty spoke about that in some detail.  It is what is

1    referred to there as the BSS manager.  And the key with

2    respect to --

3                    THE COURT:  Counsel, let me offer a suggestion.

4    I am not sure that it's useful to rehash -- I think, if I

5    were you, in the limited time, I would get into your

6    position --

7                    MR. STONE:  I will, Your Honor.

8                    A key point that Extricom did not make in

9    connection with their argument is that the manager node

10   selects one access point to respond to uplink packets within

11   a very specific time frame.  It was that speed in which the

12   manager node could select an access point to respond to an

13   uplink packet from a mobile station that it used to

14   distinguish itself over the prior art.

15                   You notice, Your Honor, the patent was filed in

16   2004.  We have some disputes about priority dates.  We will

17   raise that at another time, Your Honor.

18                   The patent didn't issue until 2010, because this

19   patent took a huge amount of effort at the Patent Office to

20   overcome all the prior art that existed.  The field was

21   already quite crowded.  As a result, there were at least

22   four rejections based on the prior art.

23                   The patentee had to submit to an examiner

24   interview, had to file a request for continuing examination,

25   had to ultimately even appeal before the patents finally

1    allowed.  As a result, as part of this lengthy six-year

2    process, they had to repeatedly amend their claims to

3    distinguish the prior art.  I think that is important,

4    because it is not really the architecture that is novel

5    here.  That architecture existed in the prior art.  That is

6    what the Patent Office said over and over and over again.

7              So what the patentee tried to do, what Extricom

8    tried to do is weave its way through that thicket of prior

9    art and come up with a very narrow implementation that it

10   believed gets around the prior art.  Whether or not it does,

11   we can argue about that later.  But the key aspect of that

12   was the speed in which the manager node could select the

13   right access point.

14             So what I have highlighted here is an excerpt

15   from the prosecution history.  And what this is focusing on

16   is, when there is multiple access points, it's more

17   difficult to figure out which access point will respond to a

18   message from a mobile station than in a scenario when there

19   is just one access point.  If that makes sense, I am sure of

20   it, Your Honor.  If there is thousands of access points in

21   Madison Square Garden, it would be more difficult for the

22   system to recognize which access point should respond to the

23   mobile station.

24             So in this case, what Extricom is saying is,

25   they have a manager node that can respond within this time

1    period, and the time period is the time period that Mr.

2    Setty alluded to, typically ten to 16 microseconds.  That's

3    the times that are set forth in 802.11A, B and G, back in

4    the day, which is the time we need to be focused on, the

5    standards that were in existence at the time of the alleged

6    invention.  So it's that speed that the patentee relied on

7    to try to get over the prior art.

8              So here is an amendment that was made near the

9    end of the prosecution history.  And again, this highlights

10   the fact that the patentee was saying, in the final

11   paragraph, the final clause, that the manager node would be

12   able to select the access point to respond to the uplink

13   packet within a time limit specified by the WLAN protocol.

14             After making that amendment, and then submitting

15   its appeal, the claims in the Extricom patent were then

16   finally allowed.

17             So I am going to quickly go through this.

18             This is the figure that Mr. Setty addressed and

19   alluded to.  There is the manager, the access points, and

20   the switches.  Those are the various mobile stations.

21             So this is another excerpt from the patent that

22   talks about this round trip where the manager node selects

23   the access point to respond to the uplink packet from the

24   mobile station.  I can illustrate how this works just real

25   quickly with Claim 27, which is one of the two independent

1    claims being asserted.

2              So there is a plurality of access points, the

3    two, AP1 and AP2 up above.  The mobile station is what sends

4    out the uplink packet.  There is reference to predefined

5    WLAN protocols, and a common basic service set

6    identification.  That is just saying that they are using a

7    common BSSID for all the access points, so the uplink packet

8    would go to both AP1 and AP2.  Then the access points

9    receive the uplink packet.  And then the access points will

10   convey a message responsive to that uplink packet to the

11   manager node, which is the BSS manager, which then processes

12   the messages, and then selects which of the access points,

13   here, it's Access Point 1, to respond to the uplink packet

14   from the mobile station within the time limit specified by

15   the WLAN protocol, a time limit specified by the WLAN

16   protocol.

17             That is basically the round trip.  It was the

18   speed in which the manager node could do that that Extricom

19   and the patentee argued got over prior art references such

20   as Bajic, which the examiner repeatedly cited.

21             So to jump into some of the specific claim

22   construction issues that we have...

23             The first one -- I apologize it's not in the

24   same order as Extricom.  There is the claim language, "a

25   common basic service set identification for all the access

1    points."  You will recall Mr. Setty addressing this issue.

2              The key dispute here, Your Honor, is that what

3    Extricom seeks to do is in essence rewrite the claims.  What

4    they want to do is to write out the word "all."

5              The claim language says, "a common basic service

6    set identification for all the access points."  We say, just

7    give the words their ordinary meaning.  Plurality and all

8    means all.  By contrast, what Extricom seeks to do is to

9    change "all" into "plurality."  There is no reason to

10   rewrite the claim in that fashion.  There is no reason to

11   try to import limitations from the specification, as

12   Extricom seeks to do, to that claim phrase.

13             Extricom knew when to say "plurality" and when

14   to say "all."  So if you look at Claim 1, Your Honor, in the

15   clause that we have highlighted here, they said "a plurality

16   of access points," that provides the antecedent basis, and

17   later, "a common basic service set identification for all

18   the access points."

19             In that context, all means all.  It doesn't mean

20   plurality.  If Extricom had intended to say plurality, they

21   certainly could have said it.  They didn't.  What they are

22   proposing would just inject confusion.

23             The same is true for Claim 27.  The language is

24   virtually identical, where they use plurality as an

25   antecedent basis, but then they say all.  And so it

shouldn't be rewritten to plurality, because it just would

contradict, and then we wouldn't be giving breadth and life

to that claim language.

The next dispute that we have -- and I apologize

again, it's not in the same order as Extricom -- is "manager

node."  We are pretty close in terms of where we are.  I

will note, there are several issues where there is a

dispute.

We did agree in connection with our response

brief to "one or more devices."  So we don't have a dispute

there any longer, Your Honor.  It's really the balance of

the proposed construction where we have some dispute.

They agree with us, Your Honor, that manager

node is not a common term in the relevant art.  It's a

coined phrase.  Since it's a coined phrase, then we have to

look to what the specification says.

The patentee could have chosen to define it any

way it wanted, and it did.  What it said was, in Column 2,

Lines 51 to 53 of the patent, "An access point manager node

on the LAN coordinates and controls the operations of the

access points as described hereinbelow."

So our proposed construction is consistent with

that.  It says, "Coordinate and control the operation of the

access points."  They agree with that, although they insert

the word "various," which I think just adds ambiguity.

1    There is no reason to do that.  It is not in the definition

2    that's found in the specification.

3              Our proposed construction also says, "over the

4    LAN," which, again, is referenced in the definition of this

5    coined term in the spec, "an access point manager node on

6    the LAN."

7              So I think that our proposed construction is

8    much more consistent with the definition in the

9    specification.

10             In addition, it's clear that the manager node,

11   because it controls and coordinates the operation of the

12   access points, that it's different and distinct from the

13   access points, which is why we have added in "and are not

14   access points."

15             The definition makes that clear, that the

16   patentee relied upon in connection with the specification.

17   And we think that adding that to the construction is

18   consistent with the definition and spec.

19             I will also note, Your Honor, and I will get to

20   access points in a minute, that it's Extricom's position

21   that access points has its ordinary meaning.  Well, that

22   wouldn't be manager node, which is a coined term.  So I

23   think excluding access points from the definition is

24   consistent.

25             I am going to skip ahead, Your Honor -- my

1    colleague is going to address the fragment terms briefly --

2    to the indefiniteness issue.

3             The second one, "Substantially in accordance

4    with IEEE standard 802.11," we didn't brief indefiniteness.

5    We believe there is case law addressing "substantially in

6    accordance with" language and that that is routinely found

7    indefinite.  So we intend to ask Your Honor for relief to do

8    that.

9             With respect to the first phrase, a couple

10   points I would like to make.  So first of all, you can see,

11   the claim term is an excerpt --

12            THE COURT:  Are you proceeding to argue

13   indefiniteness at this point?

14            MR. STONE:  No, I am not.

15            THE COURT:  What is it exactly you are doing?

16            MR. STONE:  This is the one, Your Honor, we

17   didn't intend to argue indefiniteness and we weren't

18   providing a proposed construction for the entirety of this

19   clause.  It is the portion of this clause "within a time

20   limit specified by the WLAN protocol" where we believe the

21   indefiniteness is found.  I am not going to argue

22   indefiniteness because I know that is not Your Honor's

23   preference.

24            The proposed construction that Mr. Setty was

25   referring to suggested that we were rewriting this clause.

1    We weren't.  You can see the ellipsis there.  We were just

2    identifying this as the entire clause.  So we didn't propose

3    a construction where we eliminated portions of the claim.

4    That wasn't our intention at all.

5            Our intention was to highlight this as an issue

6    that we believe is indefinite.  Mr. Setty did, though, focus

7    on the issue that we believe, if Your Honor does not find

8    that this claim term is indefinite, then we would need some

9    construction for "within a time limit specified by the WLAN

10   protocol."

11           As Extricom notes in Footnote 8 of its reply

12   brief, there is essentially an infinite number of times that

13   could exist.  And if there is an infinite number of times,

14   that could suggest indefiniteness.  But we believe that,

15   going through the prosecution history, what I referred to

16   earlier in our presentation today, where the patentee was

17   saying what distinguishes their invention from the prior art

18   is the ability for the manager node to identify the access

19   point to respond to the uplink packet within ten to 16

20   microseconds, that is the time frame that's set forth in the

21   various WLAN standards.  That is also found in the

22   specification, in Column 11, Lines 15 to 20.

23           So should the Court believe that some

24   construction is required for that last clause, we believe

25   that the time limit should be ten to 16 microseconds.  That

1    would be the only time frame that would be consistent with

2    the specification and the prosecution history, and in

3    particular, the arguments that were made repeatedly by the

4    patentee to get over the prior art such as Bajic.

5              The last point I wanted to address before I turn

6    it over to my colleague is the issue of access points.

7              So, Your Honor, we did propose a compromise last

8    night with respect to this claim.  We had previously had

9    "within a service region" at the end of our proposed

10   construction, which we believe is consistent with the

11   specification and the prosecution history.  To try to obtain

12   a compromise, we dropped that, because it appears to us,

13   based on the briefing, Your Honor, that access points as

14   used in the patent is certainly broader than just the plain

15   and ordinary meaning.

16             They talk about to practice the invention you

17   need to modify the access points.  If that is the case, then

18   we are not talking about traditional access points.  They

19   use that phrase more broadly than simply describing what an

20   access point might be to one of ordinary skill in the art.

21             I will also note --

22             THE COURT:  It could be that they meant to

23   modify the access points as understood by the person of

24   skill.

25             MR. STONE:  If that is true, Your Honor, then

1    our proposed construction is consistent with that, which is

2    just a broad construction of what an access point would mean

3    that could be subject to such modification.

4          So if you compare what we have here, "devices

5    that enable a mobile station to communicate over the air

6    with a network," even to what Extricom says is how it should

7    be construed, "component allowing network access to a mobile

8    station over a wireless medium" -- that's found at their

9    opening brief at Page 5 -- I think, Your Honor, you will see

10   that those two constructions are essentially the same.  And

11   we would say as a further compromise that we would be

12   willing to accept either of those, either what we have

13   proposed, which I think has the same elements, as what they

14   say at Page 5 of their brief as a description of access

15   point.

16         THE COURT:  You say what to that, Mr. Setty?

17         MR. SETTY:  Your Honor, the description is

18   intended to be just that.  Describing it as explaining --

19         THE COURT:  You say what to that offer of

20   compromise?

21         MR. SETTY:  It is still plain and ordinary

22   meaning, Your Honor.  We would just be paraphrasing.

23         THE COURT:  That is fine.

24         MR. STONE:  The last thing I would say, Your

25   Honor, is it is a technical term that the jurors in the box

1    wouldn't understand.  So we think it makes sense to provide

2    them with some context as to what this claim term means in

3    this context.

4              THE COURT:  What would you imagine the plain and

5    ordinary meaning to be, were that question put to you?

6              MR. STONE:  I mean, typically, Your Honor, I

7    think it would be -- if your going to say something beyond

8    access points itself, then I think we need to have some

9    description.  And since it is defined more broadly in the

10   patent --

11             THE COURT:  I am asking you, what is your

12   understanding of the plain and ordinary meaning of the term?

13   I know that you are not one skilled in the art.

14             MR. STONE:  I am not.

15             THE COURT:  But you are here today.  I am

16   assuming you have digested the relevant technology and would

17   have some understanding of how one skilled in the art might

18   view that term.

19             MR. STONE:  I think it's actually very close to

20   what Extricom has identified in their brief.

21             THE COURT:  Yes.  I am not one skilled in the

22   art.  But I have to say that my gut suggests to me that I am

23   not seeing a great bit of difference here, quite frankly,

24   gentlemen.  I am not certain why this argument is being

25   presented to the Court.

1          Let's move on.

2          MR. STONE:  Okay.  Let me turn it over to my

3     colleague.

4          THE COURT:  Counsel, I am going to cut you off

5     promptly at 1:20.  I have to be somewhere.  We will take the

6     balance of your submission in the writing.

7          MR. JAFFE:  That should be more than enough

8     time.  Apologies for the delay.

9          These two terms that Mr. Setty briefly touched

10    on, they are two related terms.  They exist in two dependent

11    claims, Claims 9 and 11.  The dispute is pretty clearly

12    framed between the parties.

13         Meru's proposal reflects the back-and-forth that

14    happened in the Patent Office.  As Mr. Stone earlier

15    discussed, the architecture that existed in the '549 patent

16    already existed in the prior art.  And what the patentee

17    said in response is, okay, we understand that.  We are going

18    to differentiate ourselves.  We are going to say, we are

19    different because what we do is we do the selection process

20    fast enough to do it within a time limit provided by the

21    WLAN protocol.  They said that didn't exist in the prior

22    art, we do that differently.

23         Now, these dependent claims take it a step

24    further.  The question is, how do they accomplish this

25    selection in such a fast fashion?  And the way that the

1   patent discloses that is they use what they describe as a

2   novel fragmentation method.

3          But that is not what they put in the claims.

4   They put in the claims configured to fragment.  So the

5   Patent Office recognized this.  They said, you know, this

6   just says fragment.  And Mr. Stone discussed the Bajic

7   reference earlier.  They said, that is in the prior art,

8   this sort of fragmentation.

9          As you can see here, the Patent Office said,

10  consider these two claims, as you can see, Bajic discloses

11  this type of fragment.  And this happened over and over

12  again.

13         The Patent Office said, you can't keep these the

14  way they are.  So the patentee did not dispute this until

15  finally in their appeal brief, which, as Mr. Stone said

16  earlier, was after the claims had been rejected four times.

17  But in response, the patentee didn't say Bajic didn't

18  disclose fragmentation.  That is exactly not what they said.

19  They said, instead, Bajic relates to only standard

20  fragmentation, whereas in the '549, we are disclosing a

21  novel form of fragmentation.

22         So as you can see here, it says, The patentee

23  responds by distinguishing standard fragmentation over the

24  claimed invention.

25         This is in accordance with what is described in

1    the file history.  As you can see here, the patentee

2    characterizes the present invention as containing these

3    novel fragmentation techniques.  And the case law is clear

4    that when the patentee describes the whole invention -- here

5    the present invention -- in such limiting terms, that that

6    therein limits the claim.

7                Now, in response, Extricom states that Meru is

8    misquoting the specification, that it really doesn't

9    describe the present invention.  But as you can see here,

10   comparing the quotes from our opening brief with the actual

11   specification, what Meru is plainly doing is just rephrasing

12   what the specification says.

13               Extricom responds and says that what Meru is

14   doing is just really pointing at the embodiment.  What it

15   does is it cites two lines of the specification.  And it

16   says, as you can see, it's just referring to embodiment.

17   But that's not actually what the specification says.

18               As you can see here, I have highlighted in green

19   what is block-quoted by Meru, referring to "Novel techniques

20   provided by the present invention enable low-latency

21   communication between the access points and manager over the

22   LAN."

23               That is what we cited in our briefs as disclosed

24   in the present invention.

25               In response, what Extricom stated in their

1        answering brief is that that only refers to some

2        embodiments, and they cite two lines of the specification.

3                     What they cite -- and I put that in the red

4        box -- does not relate to the green portion, which is the

5        citation from Meru, which actually characterizes the entire

6        invention.

7                     In response, Extricom provides no alternative

8        construction.  They have provided no responsive disclaimer

9        in the file history.  Mr. Setty didn't even mention the file

10       history.  His only response is to look at the boilerplate

11       that's contained in the specification, which actually refers

12       to the embodiment as opposed to the characterization of the

13       present invention.

14                     And so, in the end, Extricom provides no

15       response to the back-and-forth and the clear disavowal that

16       is contained in the appeal brief.  It says that's not what

17       we do.  We do something else.

18                     And with that, I will conclude, as I know you

19       have to go.

20                     THE COURT:  Thank you, counsel.  We will get an

21       order out in approximately 30 days, more or less.

22                     I am not going to entertain a response.

23                     (Counsel respond "Thank you.")

24                     (Hearing concluded at 11:17 a.m.)

25

1                                         -   -   -

2     **Reporter:   Kevin Maurer**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25